868 So.2d 114 (2003)
Brett MATHERNE
v.
POUTRAIT-MORIN/ZEFAL-CHRISTOPHE, TODSON, INC., Trek, Inc., Avenir and Tuffy's World Class Bicycle Shop, D/B/A World Class Bicycles
No. 2002 CA 2136.
Court of Appeal of Louisiana, First Circuit.
December 12, 2003.
Gregg Spyridon, Metairie, for Plaintiff-Appellant Brett Matherne.
W. Paul Andersson, New Orleans, for Defendant-Appellee Trek Bicycle Corporation.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
This is a suit for personal injuries sustained by plaintiff as a result of a bicycle accident. Plaintiff sued the bicycle's manufacturer under the Louisiana Product's *115 Liability Act (LPLA) (La. R.S. 9:2800 et seq.). Defendant manufacturer moved for summary judgment that resulted in the dismissal of some, but not all, of the claims against it. Two years later, defendant filed a Supplemental Motion for Summary Judgment that resulted in a dismissal of plaintiff's remaining claims. Plaintiff now appeals the dismissal of his lawsuit.

FACTS
The evidence reveals that in the fall of 1986, plaintiff Brett Paul Matherne ("Mr.Matherne"), then a student at Louisiana State University in Baton Rouge, desired to compete in triathion competitions. In furtherance of this objective, Mr. Matherne sought to purchase a bicycle well-suited for such competitions. Relying on the advice of other athletes, Mr. Matherne spent three to four months shopping for a bicycle that would best suit his needs.
In December 1986, Mr. Matherne purchased a model 460 Trek bicycle equipped with toe clips[1] from Tuffy's World Class Bicycle Shop d/b/a World Class Bicycles ("Tuffy's") in Baton Rouge, Louisiana. The toe clips in question were a standard accessory on the bicycle selected by Mr. Matherne, and are designed to hold a cyclist's feet in better contact with the pedals, thereby increasing pedaling power and efficiency.
The owner's manual that accompanied Mr. Matherne's bicycle, provided, in pertinent part, as follows:

Pedals and Toeclips
....

Operation. Getting on and off a bicycle equipped with toeclips is a little tricky at first, but with just a little practice, it becomes extremely easy. First straddle the bike with both feet flat on the ground. Position the left pedal up toward the handlebars. After making sure that both toestraps are wide enough to accept your shoes, place your left foot in the left clip, push forward, and mount the saddle. Flip the right toeclip rightside up by drawing your foot across the small tab on the bottom of the cage and place your right foot in the right clip. As you pedal along, reach down and tighten the straps.
Toeclips will increase your efficiency and power a great deal because you are able to pull up on the toeclip cages as well as push down on the pedals. They also prevent your feet from slipping off the pedals when they are wet or when you apply a great deal of pressure. Although toeclips are an accessory, we highly recommend them. Caution: Always remember to release the straps before coming to a complete stop.
In his deposition, Mr. Matherne recalled that when he purchased his bike in 1986, he took it for a test ride in the parking lot, and the retailer instructed him in the use of toe clips. Mr. Matherne admitted that he initially had difficulty riding with the toe clips, and fell several times while on "training" rides. Mr. Matherne stated that his first fall took place around 1986, when his bicycle was new. On this occasion, Mr. Matherne related that being unfamiliar with the use of toe clips, he tightened the straps on both of them. When Mr. Matherne came to a complete stop at a stop sign, he was unable to extricate his feet and, consequently, his bicycle fell over on top of him. After that experience, Mr. *116 Matherne began keeping the strap on his right toe clip loose because he did not like to reach down and loosen the strap before coming to a stop. Mr. Matherne related that he fell a second time while at L.S.U. When executing a turn at 20 miles per hour on a training ride, Mr. Matherne stated that he ended up in a yard.
Sometime between 1986 and 1991, Mr. Matherne stated that he purchased Detto cycling shoes, which he wore in addition to the toe clips. These specialized shoes were designed with rigid soles and featured a cleat or ledge under the instep that would fit in between the bars on each pedal. When combined with the toe clips, these shoes ensured that Mr. Matherne's foot could not unintentionally leave the pedal. Mr. Matherne surmised that he was probably wearing these shoes when he had his second accident, and further recalled that he was unable to step out of the pedals when this accident occurred.
After receiving his MBA degree from L.S.U. in 1991, Mr. Matherne was employed as a Private Banking Loan Officer for First National Bank of Commerce in New Orleans. Mr. Matherne would take regular training rides, and participated with co-workers from the bank in three consecutive two-day, 150-mile "Tour for the Cure" bicycle rides organized to raise money for Multiple Sclerosis ("M.S."). Mr. Matherne stated that he wore his cycling shoes while competing in these M.S. Bicycle Tours. Each year prior to the M.S. Bicycle Tour, Mr. Matherne had his bicycle overhauled at a bicycle shop on Freret Street. As part of one of these overhauls, Mr. Matherne requested that the leather straps on the toe clips be replaced because they had become worn due to wear.
On October 3, 1993, Mr. Matherne and a friend were completing the last miles of his third two-day, 150-mile M.S. cycling marathon, in St. Tammany Parish. While traveling at about 18 miles-per-hour, Mr. Matherne noticed that the front tire of his bicycle had gotten too close to the rear tire of his companion's bicycle. Accordingly, Mr. Matherne attempted to back off and steer slightly away. Mr. Matherne was not able to recall exactly how the accident occurred, but stated that he believed the front tire of his bicycle struck the rear tire of his friend's bicycle in front of him. This caused Mr. Matherne to lose his balance, and his bike went down. As was his custom, Mr. Matherne rode with the strap on his right toe clip loose, but kept the strap on the left toe clip tight. Consequently, Mr. Matherne's left foot remained secured to the bicycle pedal and suffered damage when the bike pulled it along its skid path.
As a result of this accident, Mr. Matherne sustained various cuts and abrasions, damage to his bicycle, and an oblique fracture of his left ankle that required surgical repair. Mr. Matherne subsequently instituted the present action in an attempt to recover damages for the injuries he suffered as a result of this accident.

ACTION OF THE TRIAL COURT
Mr. Matherne filed suit in St. Tammany Parish on September 30, 1994, alleging that "the left toe clip and toe clip strap on the bicycle failed to release plaintiff's left foot from the bicycle causing plaintiff to sustain serious and permanent disabling bodily injuries." Mr. Matherne contended that the toe clips in question were unreasonably dangerous due to inadequate warning and defective design under the LPLA. Named as defendants in this action were the bicycle manufacturer, Trek Bicycle Corporation ("Trek"); manufacturers of toe clip assembly, Poutrait-Morin S.A./Zefal-Christophe ("Christophe"), Western States Import Company d/b/a Diamondback (a/k/a Avenir) ("Avenir"); distributor *117 of toe-clip assembly, Todson, Inc. ("Todson"); and the retailer from whom Mr. Matherne purchased the bicycle, Tuffy's World Class Bicycle Shop d/b/a World Class Bicycles ("Tuffy's"). Mr. Matherne later reached a settlement with defendants Christophe, Avenir, and Todson. On March 6, 1998, Mr. Matherne obtained an order dismissing with prejudice his claims against said defendants, but reserving his claims against the remaining defendants, Trek and Tuffy's.[2]
Trek moved for summary judgment on April 6, 2000, asserting that pursuant to the LPLA and the jurisprudence interpreting it, Mr. Matherne could not rely on a known and intended attribute of the toe clip as proof of a defect in his bicycle. Additionally, Trek asserts that a manufacturer has no duty to warn users of its product about dangers that are common knowledge or which are obvious to the ordinary user. Mr. Matherne responded by filing his own motion for summary judgment on June 1, 2000, seeking a determination that he was not contributorily negligent.
In a judgment filed on June 30, 2000, the district court denied Mr. Matherne's motion regarding victim fault. The district court partially granted Trek's motion for summary judgment and dismissed Mr. Matherne's claims concerning Trek's alleged failure to provide adequate instruction and warnings. Based upon assertions contained in a late-filed affidavit of Mr. Matherne's expert, James M. Green, the district court preserved Mr. Matherne's right to pursue a theory of alternate design.
On June 25, 2002, Trek filed a supplemental motion for summary judgment seeking dismissal of Mr. Matherne's remaining claims and for all costs, including those costs associated with taking the deposition of Mr. Matherne's expert, Mr. Green. Following a hearing, the district court took the matter under advisement, and in a judgment filed on August 8, 2002, dismissed Mr. Matherne's remaining design defect claims. The district court further assessed Mr. Matherne with all costs of this case, but declined to grant additional sanctions requested by Trek.
Mr. Matherne now appeals from the district court's judgments of June 30, 2000, and August 8, 2002, that dismissed his claims against Trek.

ISSUES ON APPEAL
In connection with his appeal in this matter, Mr. Matherne sets forth the following issues for consideration by this court:
1) Whether summary judgment should have been granted when there was a genuine issue of material fact on all issues;
2) Whether the wrong instructions for use of toe clips were a characteristic of the bicycle that rendered the product unreasonably dangerous in design;
3) Whether Mr. Matherne's injuries resulted from a reasonably anticipated modification of the product which rendered the product defective in design;
4) Whether Trek had a duty to warn of the dangerous characteristics of the reasonably anticipated modifications;

*118 5) Whether an alternative design existed that was "capable" of preventing or lessening Mr. Matherne's injuries;
6) Whether the trial court erred in weighing and determining the credibility of Mr. Matherne's expert witness, and resolved disputed issues of fact and inferences in favor of Trek in order to grant summary judgment;
7) Whether the trial court erred in granting summary judgment on an issue raised sua sponte by the trial court and not litigated by the express or implied consent of the parties;
8) Whether the trial court erred in holding that clipless pedals were a "custom" or "special" feature that was only available in a specialized market such that it did not constitute an alternative design; and
9) Whether there was a genuine issue of material fact for a jury to determine whether clipless pedals were a "custom" or "special" feature available as an alternative design.

SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1034, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966 B. Summary judgment is favored and "is designed to secure the just, speedy, and inexpensive determination of every action...." La. Code Civ. P. art. 966 A(2).
The burden of proof on a motion for summary judgment is set forth in La.Code Civ. P. art. 966 C(2):
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
The initial burden of proof remains with the mover and is not shifted to the non-moving party until the mover has properly supported the motion and carried the initial burden of proof. Only then must the non-moving party "submit evidence showing the existence of specific facts establishing a genuine issue of material fact." See Scott v. McDaniel, 96-1509, p. 5 (La.App. 1 Cir. 5/9/97), 694 So.2d 1189, 1191-1192, writ denied, 97-1551 (La.9/26/97), 701 So.2d 991. If the non-moving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. La.Code Civ. P. arts. 966 and 967.
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Sanders, 96-1751 at 7, 696 So.2d at 1035. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is *119 material can be seen only in light of the substantive law applicable to the case. Walker v. Phi Beta Sigma Fraternity (RHO Chapter), 96-2345, p. 6 (La.App. 1 Cir. 12/29/97), 706 So.2d 525, 528.

DISCUSSION
Mr. Matherne has based his claim on the theory that his injuries resulted from a manufacturing characteristic of his bicycle that made the bicycle unreasonably dangerous in its design. Additionally, Mr. Matherne alleges that the manufacturer's instructions concerning the use of the product were sufficiently flawed so as to render the design of the bicycle and toe clips defective.
The LPLA provides the exclusive theories of liability for manufacturers for damage caused by their products. La. R.S. 9:2800.52. Louisiana Revised Statute 9:2800.54 establishes the elements of a cause of action under the Act. The elements, which must be proven by the claimant are: (1) the defendant is the manufacturer of the product; (2) the claimant's damage was proximately caused by a characteristic of the product; (3) this characteristic made the product unreasonably dangerous and (4) the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else. See La. R.S. 9:2800.54 A; Kennedy, John, A Primer on the Louisiana Products Liability Act, 49 La. Law Rev. 565, 583 (1989). A "reasonably anticipated use" means a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances. La. R.S. 9:2800.53(7).
In the instant case, Mr. Matherne based his claim on the theories of liability contained in La. R.S. 9:2800.54 B(2) and (3); i.e., that the Trek bicycle was unreasonably dangerous due to the design of the toe clips, and that an adequate warning about the toe clips was not provided. Pursuant to La. R.S. 9:2800.56, liability may be imposed on a manufacturer because a product is unreasonably dangerous in its design. Louisiana Revised Statute 9:2800.56, provides:
§ 2800.56. Unreasonably dangerous in design
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
Alternatively, liability may be imposed on a manufacturer, pursuant to La. R.S. 9:2800.57, because an adequate warning about the product was not provided. Louisiana Revised Statute 9:2800.57 provides:
§ 2800.57. Unreasonably dangerous because of inadequate warning
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its *120 danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

Failure to Warn
As we have previously noted, the district court dismissed Mr. Matherne's claims concerning Trek's alleged failure to provide adequate warnings in its partial grant of Trek's motion for summary judgment filed on June 30, 2000. In dismissing Mr. Matherne's claims against Trek, the district court stated in pertinent part:
In the present case, it seems almost elementary that an experienced cyclist would obviously be aware of the potential hazards of having his feet clamped to the pedals in the event of a sudden stop or accident. The user obviously, and knowingly, trades off this risk for the benefits of enhanced performance through a constant application of power to the pedals throughout the rotation. Therefore, under the undisputed facts of this case, the Court concludes that [Mr. Matherne] is not entitled to recover under this theory of liability.
In its motion for summary judgment, Trek challenged the ability of Mr. Matherne to establish that a characteristic of the toe clips on his bicycle made them unreasonably dangerous, or that it had a duty to provide an adequate warning about the toe clips. Mr. Matherne responds with the contention that in 1992, Trek significantly changed the bicycle's owner's manual and warned about the possibility of bodily injury resulting from the improper use of the toe clips and straps. In addition, the 1992 Trek manual no longer advised owners of its bicycles to tighten the straps of the toe clips. Mr. Matherne points out that the new instructions recommended the following:

Always keep toe straps loose while riding any place where you may need to remove your feet from the pedals to remain upright.
Mr. Matherne contends that his injuries would not have occurred if the information contained in the 1992 manual had appeared in his 1986 manual. We note however that the owner's manuals are consistent in their admonition that toe straps must be loose for a cyclist to remain upright when stopped.
The primary danger posed by the use of toe clips is that a cyclist may not be able to get his foot off of the pedals in the event of a fall. Mr. Matherne clearly stated in his deposition that at the time of his accident he knew of both the complained of characteristics of the toe clip and the possible dangers of these characteristics. In his *121 deposition, Mr. Matherne responded to questions as follows:
Q. And it was the objective, it was the purpose, of the [toe] strap to hold your foot tight onto the pedal, was it not?
A. To maximize pedal potential, sure.
With respect to Trek's alleged failure to warn, Mr. Matherne engaged in the following colloquy:
Q. Prior to your fall in 1993, so long as the strap [on the toe clips] was on tight, you knew there was no opportunity for release other than something that you would have performed; is that right?
A. That's correct.
Q. So that while riding moments before the accident occurred, you knew that your left foot would not be released by this toe clip assembly unless you loosened the strap?
A. Correct.
Q. Yet, the strap was kept tight by you on your left foot.
A. To maximize the pedaling potential, yes.
Again, in his deposition, Mr. Matherne was asked:
Q. Did you understand in 1986 or '87 when you fell at the stop sign that when toe clip straps were tight, the possibility of injury existed?
A. I know the possibility of falling existed because that was my experience.
Q. Did you know as well that when one fell, one ran the possibility of an injury?
A. I know that now.
Q. No, that's not my question, Mr. Matherne. My question is very simple. When you fell at the stop sign, did you know, either at that time or immediately thereafter, that when your straps were both tight, you could fall, and that in falling, you could be injured?
A. Yes.
Q. Thank you.
We agree that the record reflects that Mr. Matherne was a sophisticated user of the toe clips, and had used them continuously since he purchased his Trek bicycle seven years earlier in 1986. Mr. Matherne admitted that he had actual knowledge, coupled with personal experience, that the toe clip system would hold his feet securely in place during a fall and that this characteristic could lead to injury. This knowledge covers more than would be required by any reasonable warning, yet Mr. Matherne continued to use the toe clips and even purchased special shoes to further insure that his feet would not slip off the pedals. Accordingly, the district court was correct in granting Trek's motion for summary judgment with respect to Mr. Matherne's claims concerning Trek's alleged failure to provide adequate warnings.

Availability of an Alternative Design
Mr. Matherne asserts that the design of the toe clips on his bicycle held his feet to the pedals of the bicycle after his crash, and this made the Trek bicycle unreasonably dangerous and, also, defective.
In an effort to defeat Trek's motion for summary judgment, Mr. Matherne submitted the affidavit of James M. Green, a civil engineer and "bicycling expert." In his affidavit, Mr. Green stated, in pertinent part:
At the time the Trek bicycle and toe clips left the defendant's control in 1986, there existed an alternative design for the product which was available to Trek and it would be reasonable to expect that Trek employ this technology and design.
This and other allegations contained in Mr. Green's affidavit were sufficient to defeat Trek's initial motion for summary *122 judgment as to whether there existed an alternate design for the toe clips. Thereafter, Trek deposed Mr. Green, in Asheville, North Carolina, and in his subsequent deposition testimony, Mr. Green responded as follows:
Q. What manufacturers of bicycles in June of 1986 were providing as original equipment on their model lines alternatives to the toe clip system?
A. And I'm to assume this is the general-use cycle?
....
Q. I've eliminated the custom cycle manufacturer. There are people who, as you well know, Mr. Green, make up frame sets for individuals on a custom order basis that aren't available in your bike store, either here in Asheville or in New Orleans.
....
A. Okay. Now I'm with you. I'm not aware of any [bicycle manufacturers] in [the general-use] category that provided other alternatives other than the toe clip system in 1986.
....
Q. Okay. Do you know when the types of manufacturers that I just cataloged for you, and any others that you can think of that fall into that category, began to offer alternative designs to toe clips on their bicycle lines?
A. I became aware of it from my work on or about from 1990 on, is when I first started seeing alternative designs. But I have not done an exhaustive industry study on that issue.
Later on his deposition, Mr. Green admitted that toe clips of substantially the same design as those on Mr. Matherne's bicycle are still offered for sale in reputable bicycle shops throughout the country, Mr. Green further stated that the toe-clip system utilized by Mr. Matherne did not violate Consumer Product Safety Commission standards, and is generally less expensive than alternative foot retention systems that require the user to purchase additional equipment such as specialized shoes to make them work.
Perhaps most importantly, in Mr. Green's deposition, the following colloquy took place:
Q. Okay. You can fall and injure an ankle with a clipless pedal [foot retention system] as well as with a toe clip system; is that right?
A. Generally, yes.
Q. You can suffer serious injury to an ankle with a clipless pedal system, can you not?
A. Yes.
Q. Falls frequently occur so quickly that a cyclist, even an experienced cyclist, is sometimes unable to get his foot loose even with a clipless system, wouldn't you agree?
A. I would agree that he voluntarily does not have enough time in a fall. There's just not enough perceive-react time there available for them, with whatever system he has.
With respect to the conflicting instructions regarding the use of toe clips contained in the 1986 owner's manual and later editions of said manual, Mr. Green responded in his deposition as follows:
Q. Do you have an opinion as to which would have been the correct instructions?
A. Well that is the problem. To be the most effective, they [the straps on the toe clips] need to be tight. To be able to stop suddenly, or for them to release during a fall, they need to be loose. So it puts the user at a disadvantage, extreme disadvantage, in not knowing what's the most effective versus what's the most safe...."
*123 Trek asserts that Mr. Matherne not only intended for the toe clip to perform exactly as it did, but also knew of an alternative method to secure his foot to the pedal but chose not to use it. The following colloquy took place in Mr. Matherne's deposition:
Q. Did you, Mr. Matherne, during the course of your ownership of this bicycle between 1986 and 1993 ever investigate replacing or updating the mechanism that held your foot or shoe to the pedal or to the bicycle?
A. I was thinking of buying a new bicycle.
Q. All right. But my question is a little different.
When did you first become aware that the industry had available what we now call clipless pedals? Do you know what I am talking about?
A. Sure.
I think the first one I remember might have been in 1991.
Q. Would you have seen those, say, in the bicycle magazines? I think they were fairly a[sic] big item in those days.
A. I think I saw it at the MS [Bicycle] Tour.
....
Q. You saw them on the first MS Tour in 1991?
A. That is what I think.
Q. And did you investigate the cost or the utility of those items?
A. Someone did tell me the cost.
Q. And were you interested in replacing the clip and strap mechanism that you had with the newer technology?
A. No. Otherwise, I would have done that.
Q. Were there any advantages to the clipless pedals that you found attractive?
A. I did not really investigate them.
....
Q. In talking to people in cycling, what did you learn about [clipless pedals]?
A. That there was no toe cage and no strap; that you had to buy the shoe and the pedal mechanism. That's about the extent of it.
Q. Did you learn anything about how they came to release the shoe?
A. I think the best of my recollection is that if you turn your foot to the side or something, they pop out.
Q. And, accordingly, you didn't have a strap that you had to physically release?
A. Right.
Q. Did you find that a feature that was attractive to you?
A. I didn't know whether or not that's attractive. It wasn't something that I had to have.
Q. All right. Were you interested in eliminating the necessity of reaching down and loosening a strap?
A. As a convenience, yeah, that might have been attractive. But I didn't, you know, seek out and go buy the pedals.
Q. Was it a financial matter? Or just a matter of convenience you didn't think you needed?
A. I think it wasI don't know what the matter was. It's so long agobut I think it was so new to the market, that I wasn't going to move on something new to the market or something that I really had no knowledge about.
Considering the foregoing, we believe it is evident that prior to his accident, Mr. Matherne had knowledge of alternate foot retention systems that alleviated the need for the user to manually loosen straps in order to release the foot; however, Mr. Matherne was not interested in this design. While we agree that under the right set of circumstances, the toe clip system can pose a danger to some users, *124 this danger is apparent, and consequently, we do not find said danger to be unreasonable.
Mr. Matherne has not pointed to a safer, alternative design that would have provided the same benefits, nor has he shown that the utility of the toe clips was outweighed by their risk of harm. Accordingly, the district court's grant of summary judgment was proper.

CONCLUSION
For the above and foregoing reasons, the decisions of the district court granting defendant Trek's motions for summary judgment and dismissing the claims of Mr. Matherne, are hereby affirmed. All costs associated with this appeal shall be assessed against Mr. Matherne.
AFFIRMED.
NOTES
[1] A toe clip is a thin metal cage attached to each pedal that holds the toe of a cyclist's shoe together with an adjustable leather strap that goes over the instep of the cyclist's foot. The toe clip is designed so that when the leather strap is manually tightened, the cyclist's foot will be securely fastened to the pedal. In order to get the foot off of the pedal, the strap must be manually loosened.
[2] Mr. Matherne was unable to serve defendant Alan Troy, d/b/a Tuffy's World Class Bicycles d/b/a World Class Bicycle Shop ("Tuffy's"), and as a result, said defendant never made an appearance in this lawsuit. Mr. Matherne's claims against Tuffy's were ultimately dismissed without prejudice following the decision by the district court to grant summary judgment.